UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

OLIVIA TEXIERA,

        Plaintiff,

  – against –

TAKARA BELMONT USA INC.,

        Defendant.

---

Case No.:  21-cv-6085

COMPLAINT
AND JURY DEMAND

---

Plaintiff OLIVIA TEXIERA, by her attorneys Goddard Law PLLC, complains of Defendant as follows:

## NATURE OF THE ACTION

1.    Plaintiff Olivia Texiera (hereinafter "Plaintiff") brings this action against Defendant Takara Belmont USA Inc. due to its unlawful discrimination, harassment, and hostile work environment against Plaintiff on the basis of her gender, pregnancy, disability, and race in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq.,* as amended by the Civil Rights Act of 1991 ("Title VII"); the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. §§ 12101 *et seq.* ("ADA"); the New Jersey Law Against Discrimination ("NJLAD"), N.J.S.A. 10:5-1 *et seq.* ("NJLAD"); retaliation including, but not limited to, wrongful termination or constructive termination for opposing Defendant's unlawful discrimination; and retaliation and interference with Plaintiff's rights in violation of the Family Medical Leave Act, 29 U.S.C. §§ 2601 *et seq.* ("FMLA").

## JURY DEMAND

2.    Plaintiff demands a trial by jury.

## JURISDICTION AND VENUE

3.      This Court has original jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. §§ 1331 and 12117(a), and 29 U.S.C. § 2617(a)(2).

4.      This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 42 U.S.C. § 1367(a) because those claims are so related to the federal claims that they form a part of the same case or controversy between Plaintiff and Defendant.

5.      Venue for this action properly lies in this district pursuant to 28 U.S.C §§ 1391(b)(3) because Defendant's principal place of business is in this district.

## PROCEDURAL REQUIREMENTS

6.      On July 7, 2020, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging claims of race, sex, disability, and pregnancy discrimination, retaliation, and violations of the FMLA.

7.      On or about January 28, 2021, Defendant submitted a position statement in response to the Charge.

8.      On April 20, 2021, the EEOC issued Plaintiff a Notice of Right to Sue. This action is being brought within 90 days of Plaintiff's receipt of her Notice of Right to Sue.

## THE PARTIES

9.      Plaintiff Olivia Texiera ("Texiera") is an African-American female who resided in New Brunswick, New Jersey at all relevant times.  Plaintiff was subject to discrimination, retaliation, and interference while employed by Takara Belmont USA Inc. ("Defendant" or "Takara" or the "company").

10.     Plaintiff was, at all times relevant herein, Takara's "employee" within the meaning of all relevant federal, state and local laws.

11. Takara is a corporation organized under the laws of New York. Its principal place of business is located at 17 West 56th Street, New York, New York.

12. Takara was, at all times relevant herein, Plaintiff's "employer" within the meaning of all relevant federal, state and local laws.

## FACTUAL ALLEGATIONS

### Plaintiff is Hired with Significant Experience in Her Field

13. On or about September 24, 2018, Plaintiff interviewed for a position at Defendant as a Dental Customer Service representative. She was interviewed at Defendant's offices by its Human Resources Manager Alaina Plytynski (hereinafter "HR Manager Plytynski") and Manager Claudine Noel (hereinafter "Manager Noel"). As a result of this interview, Defendant offered Plaintiff the job. Plaintiff was to begin the job as a temporary employee through Personal Connections Temp Agency.

14. Plaintiff had significant experience in the field, including 12 years of customer service experience. As a Dental Customer Service representative, Plaintiff fostered relationships between clients and Defendant, and also communicated with Sales Representatives on behalf of the company.

15. As a Dental Customer Service Representative, Plaintiff also worked closely with the Production Team, which was led by Vice President of Production Tobe Dussinger (hereinafter "VP Dussinger"), who is Hispanic or of mixed race. The Production Team consisted solely of Hispanic individuals.

16. Meanwhile, the Customer Service Representatives, like Plaintiff, were mostly African-American.

17.     On or about February 11, 2019, Plaintiff was promoted to a permanent employment role.

18.     As both a temporary and permanent employee, Plaintiff worked full-time, 40 hours a week in Defendant's New Jersey office.

19.     As a temporary and permanent employee, Plaintiff excelled at her job, and was frequently complimented for her professionalism and work performance by clients and sales representatives.

**Plaintiff Is Injured in a Car Accident, and Finds Out That She Is Pregnant**

20.     On or about March 30, 2019, Plaintiff, her husband, and her daughter were in a car accident.  Plaintiff and her husband were both injured.

21.     Plaintiff contacted her supervisor, Carolyn Davis, (hereinafter "Supervisor Davis") about the accident, and received approval to take several days off while she recovered.

22.     When her injuries were treated, Plaintiff found out that she was pregnant at the time of the accident, and immediately feared not only for her own health, but the health of her unborn child.

23.     During the car accident, Plaintiff sustained a serious back injury. The doctors were concerned that her pregnancy would impact this injury. Specifically, that the pressure on her back from the pregnancy could interfere with her recovery from the injury, and that the back injury, if not properly addressed, could create significant pregnancy and delivery complications.  Notably, Plaintiff could not take the pain medications that would normally be prescribed to someone with her injuries, and so physical therapy and medical monitoring became especially important.

24.     As she began treatment for the injury she suffered in the accident, Plaintiff was informed that she would require chiropractor appointments three times a week for several months,

in order to fully recover.  Notably, Plaintiff was also informed that, due to her pregnancy, she would require a specialized treatment from a chiropractor which would require more time than the treatment that a non-pregnant person would require.

25.     Due to her pregnancy, Plaintiff also needed to begin regular prenatal appointments.

**Plaintiff is Denied Her Preferred Accommodation for her Chiropractor Appointments Without Any Stated Reason**

26.     In or about April 2019, Plaintiff informed Supervisor Davis of her pregnancy and that she needed to see a chiropractor three times a week.

27.     Plaintiff explained to Supervisor Davis that she would be able to minimize any disruption to her work schedule if she could work from 8 a.m. to 5 p.m., like most employees, instead of 9 a.m. to 6 p.m., which was the shift that she had been assigned without explanation.

28.     Plaintiff did not understand why she was forced to work an hour later than most of her colleagues.  After her colleagues left at 5 p.m., the office was empty, and there were typically no calls or emails.

29.     Plaintiff could not make appointments at her chiropractor's office any later than 6 p.m. due to her chiropractor's office hours, the amount of time her treatment required, the amount of time it took to commute from her office to the chiropractor's office, and her childcare arrangements for her seven-year-old daughter.

30.     Plaintiff made several requests to Supervisor Davis to take up her concerns with upper management, find out why she was assigned to work from 9 a.m. to 6 p.m. in the first place, and if her hours could be changed to allow her to work from 8 a.m. to 5 p.m. so that she could receive treatment.

31.     Supervisor Davis consistently reported back to Plaintiff that both HR Manager Plytynski and VP Dussinger refused to change Plaintiff's hours, and refused to discuss the subject any further.

### Co-Worker Figueroa Is Hired, and Manager Noel Is Promoted

32.     On or about May 1, 2019, Manager Noel was promoted to manager of both the beauty and dental departments.  Manager Noel became one of Plaintiff's supervisors.

33.     On or about May 1, 2019, Cheiny Figueroa, who is Hispanic, (hereinafter "Co-Worker Figueroa") was hired and brought on to the Dental Customer Service Team as a Customer Service Representative.

### Plaintiff Advises Supervisor Davis That She Is Beginning Chiropractor and Prenatal Appointments

34.     Plaintiff advised Supervisor Davis that she was beginning chiropractor appointments to treat her back injury, and prenatal appointments because of her pregnancy. On or around May 1, 2019, with Supervisor Davis's approval, Plaintiff again began occasionally leaving work about 30 minutes early, at 5:30 p.m., to get to her doctor's appointments on time.

35.     With Supervisor Davis's approval, Plaintiff began going to prenatal appointments, seeing a chiropractor three times a week, and seeing an orthopedic surgeon once a month.

36.     Since most of Plaintiff's colleagues left work at 5 p.m., Plaintiff rarely missed any work if she left at 5:30, and the work she did rarely miss she could easily be completed the following workday.

37.     On or about July 3, 2019, Plaintiff spoke with HR Manager Plytynski about her need for continued medical appointments.  Plaintiff provided two doctor's notes verifying she needed to see a chiropractor three times a week and an orthopedic surgeon once a month.

38.     At HR Manager Plytynski's request, Plaintiff provided her with documentation of the scheduled appointments.  HR Manager Plytynski then approved Plaintiff's continued medical appointments with the chiropractor and orthopedic surgeon.  HR Manager Plytynski did not instruct Plaintiff to submit documentation for each appointment going forward.

39.     Plaintiff continued to complete all of her work successfully.

40.     In fact, Plaintiff's sales representatives continued to give her positive feedback about her performance, and, upon information and belief, did not even know that Plaintiff was pregnant or suffering from a disability, only that she was regularly exceeding expectations of her job performance.

### Hispanic Employees Experience Preferential Treatment from VP Dussinger, to the Detriment of Plaintiff and Other African-American Employees

41.     Despite Plaintiff's excellent performance, she and other African-American Customer Service Representatives frequently noticed that they were singled out for blame and ridicule by VP Dussinger for a mistake or delay that was occasioned by a member of the Production Team.  Customer Service Representatives worked collaboratively with the Production Team, as both of these jobs involved planning to produce the materials that customers wanted.  For this reason, if a Production Team member made a mistake in production, it affected everyone, particularly Customer Service Representatives who dealt with disgruntled clients.

42.     For example, in or about May 2019, Plaintiff corrected a shipping error to a customer. Neither the Production Team nor the shipping team gave her any help to correct this error, although the error had originated with the Production Team and/or shipping team.  Despite this, VP Dussinger scrutinized Plaintiff's response time and criticized her for not resolving the error quickly enough.

43.     The Production Team consisted entirely or almost entirely of Hispanic employees. VP Dussinger frequently singled out African-American Customer Service Representatives to blame for mistakes made by members of the Production Team.  For example, the Production Team on occasion failed to achieve same-day shipping on an order after claiming to have lost the paperwork submitted by a Customer Service Representative, or after advancing the cutoff time for submission of the paperwork without advising the Customer Service team of the change.

44.     Plaintiff frequently discussed the unfair treatment of African-American Customer Service Representatives with Supervisor Davis, who was African-American, and co-worker Dominique Roundtree (hereinafter "Co-Worker Roundtree") who was an African-American Customer Service Representative.

45.     On several occasions Plaintiff, Supervisor Davis, and Co-Worker Roundtree discussed the preferential treatment of Hispanic employees by VP Dussinger, how this unfair treatment made their jobs needlessly difficult, and their desire to find other employment where they could be treated fairly and equally.

46.     In addition, upon information and belief, the Hispanic employees were regularly paid at higher rates of pay than the African-American employees.  Plaintiff's belief on this point is based on the preferential treatment in all respects that the Hispanic employees enjoyed, and the deference they were shown by supervisors.

47.     When Plaintiff offered to work overtime to help with a backlog of work, her offer was rejected.  Thus, upon information and belief, the preferential treatment enjoyed by Hispanic employees included compensation matters.

**Co-Worker Roundtree Resigns Over Her Discriminatory Treatment at Defendant**

48.    On or about April 15, 2019, Co-Worker Roundtree resigned over the ongoing, discriminatory treatment she was subjected to at Defendant.

49.    In her exit interview, Co-Worker Roundtree stated she "felt bullied" by upper management, was subjected to "unfair treatment," a "lack of appreciation," and being "overworked."  Co-Worker Roundtree told Plaintiff that she believed she was treated this way because she was African-American and the company treated African-Americans more harshly than other employees.

50.    Upon information and belief, HR Manager Plytynski, who conducted the exit interview, made no further investigation into Co-Worker Roundtree's serious claims of her disparate treatment at Defendant.

**Supervisor Davis Is Terminated, and Plaintiff's Direct Report Is Changed to Manager Noel**

51.    On or about August 20, 2019, Supervisor Davis was terminated from Defendant, and Plaintiff's direct report was changed to Manager Noel.

52.    After Plaintiff's sales representatives learned that Supervisor Davis was terminated, several of them called Plaintiff to tell her they were shocked at Supervisor Davis's termination and did not perceive any reason for it.

53.    Several sales representatives told Plaintiff they wanted her to be their account manager.  One sales representative even informed Plaintiff that they spoke to Manager Noel and asked that Plaintiff be made their account manager because they were so pleased with her work. This sales representative told Plaintiff that Manager Noel immediately dismissed the request.

## Co-Worker Cheiny Is Effectively Promoted, and Plaintiff Protests

54.     On or about August 21, 2019, Manager Noel called the Dental Customer Service team into a meeting.  In this meeting, Manager Noel announced that Co-Worker Figueroa would be granted even more Sales Representatives than she already had, thus giving her more sales representatives than Plaintiff.   This was unfair because Plaintiff was the most experienced Customer Service Representative at the company.

55.     Upon hearing this, Plaintiff questioned Manager Noel during the meeting about why Co-Worker Figueroa, a new employee, had more sales representatives than her, the most senior Customer Service Representative.

56.     Manager Noel dismissed Plaintiff's question without answering, and moved on with the meeting.

57.     Later in the meeting, Manager Noel announced that Co-Worker Figueroa would be attending "Morning Meetings."  Morning Meetings were held every day at about 8 a.m.  During the Morning Meetings, Team Leaders, Managers, and Supervisors met to ensure that the day would go as planned.  They discussed shipping schedules, information that needed to be communicated to team members, and any issues or concerns.   By attending Morning Meetings, Co-Worker Figueroa was effectively promoted to team leader.

58.     Plaintiff spoke up in the meeting and said that she had asked multiple times to have her work hours changed to 8 a.m. to 5 p.m., which were the hours that most of her co-workers worked, and questioned why she was assigned to work 9 a.m. to 6 p.m. in the first place; she said she thought it was clearly impeding her career progression.

59.     Manager Noel immediately dismissed Plaintiff's comments and moved on with the meeting.

**Plaintiff Is Reprimanded for Going to Medically Necessary Appointments, and Speaking
Out Against Co-Worker Figueroa's Preferential Treatment**

60.     On or about August 22, 2019 (the next day), Manager Noel told Plaintiff that she
and HR Manager Plytynski wanted to meet with her that day to discuss her request to have her
hours changed.

61.     At the meeting, only HR Manager Plytynski was in attendance.  She gave Plaintiff
a written warning from Manager Noel stating that if Plaintiff continued to take "excessive leave"
she would be terminated.

62.     Plaintiff, shocked to have her job so suddenly and baselessly threatened, explained
that she was not taking "excessive leave," but attending medically necessary doctor's
appointments, which were all approved by Supervisor Davis and HR Manager Plytynski, and
which she only had to miss because the company refused to adjust her hours.

63.     Plaintiff reminded HR Manager Plytynski that she had already provided her with
doctor's notes regarding her appointments and her need for continued treatment in July.

64.     Plaintiff also asked HR Manager Plytynski if her "excessive leave" was such an
issue, why she had never mentioned it to her before?  HR Manager Plytynski replied that she had
"been busy."

65.     Upon information and belief, Manager Noel and HR Manager Plytynski gave
Plaintiff this written warning as retaliation for speaking out against Co-Worker Figueroa's
preferential treatment during the meeting the day before.

66.     Upon information and belief, the written warning effectively removed Plaintiff's
previous accommodation to occasionally leave work early for her doctor's appointments.

**Plaintiff Objects to Her Written Warning**

67.     On or about August 26, 2019, Plaintiff emailed Manager Noel about the written warning she had received about her alleged excessive absences.  Plaintiff stated that she refused to sign the written warning because it listed an inaccurate number of absences, and that she had provided proof of medical necessity for any appointments that she that she missed work for.  She said that she wanted to discuss the matter further to come to a more reasonable outcome, considering the continued needs of her back injury.  Plaintiff also mentioned in this email that she had provided documentation of her doctor's appointments to HR Manager Plytynski, and that her appointments had been approved.

68.     Manager Noel never responded to Plaintiff's email in writing or verbally.

**Manager Noel and HR Manager Plytynski Refuse To Provide Plaintiff with a Reasonable Accommodation, and Plaintiff Requests FMLA Leave**

69.     On or about August 27, 2019, since Manager Noel had not responded to Plaintiff, she decided to send Manager Noel a calendar invite to set up a meeting that day to discuss her concerns with the written warning.  In the body of the invite, Plaintiff noted to Manager Noel that she had still not received a response to her previous email.

70.     Manager Noel agreed to meet with Plaintiff, but rescheduled the meeting to the following day.

71.     On or about August 28, 2019, at the scheduled time of the meeting, Manager Noel called Plaintiff into HR Manager Plytynski's office.  Plaintiff had only scheduled a meeting with Manager Noel, but needed to address her serious concerns with the written warning so did not object to this last-minute change.

72.     Plaintiff stated again that she had doctor's notes to excuse all of the time she was written up for, that she was approved by Supervisor Davis to go to the same appointments that she

was written up for, and that she provided doctor's notes to HR Manager Plytynski documenting her need for continued medical care.  Plaintiff asked if, given these facts, her written warning could be revised or removed, and stated that she could provide additional doctor's notes if necessary.

73.    Plaintiff was extremely concerned about the threat of termination in the write-up, and she also knew that such negative feedback in her file greatly hurt her chances at promotion. Plaintiff also knew she would need to continue the same appointment schedule for the next several months, and was trying to protect her future at the company.

74.    Plaintiff then again requested the reasonable accommodation of changing her work schedule to 8 a.m. to 5 p.m., which most of her co-workers worked, so that she would be able to go to the necessary doctor's appointments without missing work.

75.    HR Manager Plytynski and Manager Noel immediately dismissed and rejected this request, stating to Plaintiff that they "don't have to change anything," and gave no other justification or explanation of why Plaintiff's request could not be accommodated.

76.    Plaintiff next asked why the written warning could not be revised or reviewed, and again stated that she could provide further documentation listing all of the doctor's appointments she had attended.

77.    HR Manager Plytynski and Manager Noel, seemingly amused that Plaintiff was so adamantly trying to protect her job, laughed in Plaintiff's face at the prospect of changing or removing her written warning, or changing her hours.  They refused to accept additional documentation or change or remove the written warning.

78.    Plaintiff was frustrated and humiliated that her supervisor and HR Manager refused to take her medical needs seriously.  She confronted HR Manager Plytynski and asked why she refused to accept her documentation of her doctor's appointments; she reminded her that this was

now the third time that HR Manager Plytynski had refused to accept the documentation and consider Plaintiff's medical needs.  Rather than respond, HR Manager Plytynski sat stonily and cracked her knuckles ostentatiously.  This intimidated Plaintiff, and upon information and belief that was the effect that HR Manager's Plytynski intended to have.

79.    Plaintiff feared how HR Manager Plytynski and Manager Noel would react to hearing she was pregnant, given their treatment of her so far.  Plaintiff then informed HR Manager Plytynski and Manager Noel that she was pregnant and inquired about her FMLA eligibility.

80.    HR Manager Plytynski and Manager Noel looked at each other in shock and did not offer a word of congratulations to Plaintiff on her pregnancy.

81.    Plaintiff requested a total breakdown of her hours worked at the company and asked HR Manager Plytynski for confirmation if her hours worked in the first months of her job as a temporary employee counted towards her FMLA eligibility. HR Manager Plytynski said she would get back to Plaintiff with that information.

82.    HR Manager Plytynski then suddenly stated that she would "consider accepting [Plaintiff's] documentation," but still claimed she "[doesn't] have to" accept it.

83.    Plaintiff stated that she would send the documentation, but questioned why HR Manager Plytynski suddenly wanted documentation of her doctor's appointments after repeatedly refusing to accept it and to revise or remove her written warning.

84.    HR Manager Plytynski acknowledged that she had repeatedly refused to accept Plaintiff's documentation and revise or remove the written warning, but said that she would "think about it" now.

85.     On or about August 29, 2019, HR Manager Plytynski followed up with Plaintiff by email.  HR Manager Plytynski requested a letter from a physician documenting every appointment Plaintiff missed work for from July 1 through August 20, 2019.

86.     In this email, HR Manager Plytynski also confirmed that Plaintiff's start date as a permanent employee was February 11, 2019, and her total hours worked as a permanent employee was 899 hours.  HR Manager Plytynski further stated that she had requested Plaintiff's total hours worked as a temporary employee from her temp agency, Personal Connections.

87.     Plaintiff responded to the email and expressed her remaining concerns after their meeting the day before.  She stated that she was shocked that she was given a written warning for leaving work for medical appointments that were approved by her former supervisor, and that no one had ever claimed her attendance was a concern before.

88.     Plaintiff again requested that her hours be changed to 8 a.m. to 5 p.m., which most of her colleagues worked, to allow her to attend necessary medical appointments without needing to miss or make up any work time.  Plaintiff also noted that she was being denied leadership opportunities at the company by not being allowed to work 8 a.m. to 5 p.m. and attend Morning Meetings.

89.     She also asked HR Manager Plytynski to confirm if her written warning would be revised or removed after she provided the doctor's notes.

90.     Plaintiff received no response and her concerns stated in the email were never addressed.

91.     Plaintiff later replied with the requested documentation as soon as she received it from her doctors.

92.     The documentation of Plaintiff's doctor's appointments show that Plaintiff scheduled the vast majority of her chiropractor appointments at 6 p.m. to cause as little disruption to her work hours as possible; scheduled weekend chiropractor appointments whenever possible; scheduled her orthopedic surgeon appointments as late in the evening as possible on work days. Unfortunately, the orthopedic surgeon did not take weekend appointments and did not take weekday appointments later than 5 p.m.

93.     Despite Plaintiff repeatedly requesting a reasonable accommodation to work from 8 a.m. to 5 p.m. like most of her coworkers, and despite her providing ample evidence that this reasonable accommodation would allow her to go to the vast majority of her appointments without missing work, the company refused to provide the reasonable accommodation.

94.     Moreover, despite HR Manager Plytynski saying she would "think about" revising or removing Plaintiff's discriminatory written warning upon receiving the documentation of Plaintiff's doctor's appointments, the written warning was never revised or removed.

95.     As a result of HR Manager Plytynski's and Manager Noel's complete refusal to provide her a reasonable accommodation so she could attend her medically necessary appointments, Plaintiff's anxiety and insomnia worsened.

**Plaintiff Begins Suffering from Anxiety and Insomnia Due to Her
Treatment at the Company**

96.     Plaintiff was severely distraught to be threatened with termination simply for treating her back injury and going to prenatal appointments.  Plaintiff knew that she needed to continue going to her chiropractor appointments, as her back injury worsened with the progression of her pregnancy.

97.     As a result, Plaintiff became extremely anxious and suffered from insomnia due to her fear of losing her job and benefits while pregnant and with a serious back injury.  Plaintiff's

OBGYN doctor became increasingly concerned about her mental health and the impact that it was having on both her back injury and her pregnancy, and she suggested that Plaintiff see a social worker for mental health counseling.

98.     Plaintiff began seeing a social worker through her OBGYN office.   Plaintiff discussed her mental health concerns arising from her treatment at the company.

99.     On multiple occasions, Plaintiff requested time off to go to doctor's appointments that required her to miss a small amount of work due to her doctor's schedules, but she got no response from HR Manager Plytynski or Manager Noel, and she was often forced to cancel medically necessary appointments out of fear for losing her job.

100.     Manager Noel and HR Manager Plytynski frequently did not respond to her emails when she provided notice of upcoming appointments, did not respond in a timely fashion, or continued demanding doctor's notes as if they were unaware that Plaintiff required continued care. Plaintiff provided doctor's notes whenever she was asked for them.

### Plaintiff Inquires about FMLA

101.     On or about August 30, 2019, Plaintiff received an email from HR Manager Plytynski saying that Plaintiff should contact ADP (the company's payroll company) with her questions about FMLA.

102.     That same day, Plaintiff called ADP to inquire about her FMLA eligibility, and whether her hours worked as a temporary employee counted towards FMLA eligibility requirements.

103.     On September 5, Plaintiff received an email from ADP confirming that her hours worked as a temporary employee did count towards overall hours required to qualify for FMLA.

104.    Plaintiff had worked full-time since she started as a temporary employee on September 24, 2018, so she knew she would meet the 12-month, 1250-hour requirement for FMLA eligibility within the next few weeks.

105.    Plaintiff continued following up with ADP about her eligibility for FMLA.  On or about September 13, 2019, she received an email from an ADP representative, Alex Machado, who confirmed again that her hours worked as a temporary employee would count towards her hours required for FMLA eligibility.

106.    The ADP representative Machado also volunteered the information that if the hours reported to ADP by Defendant did not reflect Plaintiff's full hours worked there, then ADP would reach out to Defendant for further investigation.

### The Company Intensifies Its Hostility

107.    On or about September 5, 2019, HR Manager Plytynski sent an email to Plaintiff, reiterating that Plaintiff must schedule all of her doctor's appointments after work hours.

108.    Plaintiff replied to this email the next day and confirmed to HR Manager Plytynski that her appointments were scheduled outside office hours whenever possible.  Plaintiff said that she had always provided advance notice of her doctor appointments to Supervisor Davis and would continue to do so.

109.    For the rest of her time at the company, Plaintiff consistently provided notice in advance and obtained doctor's notes for every appointment she went to during work hours.  She provided advance notice and documentation of each appointment to HR Manager Plytynski and Manager Noel by email, as well as doctor's notes following each appointment.

110.    Plaintiff was unable to schedule all of her appointments outside of work hours due to her doctor's office hours, the amount of time needed for the appointment, her ability to make

childcare arrangements for her seven-year-old daughter, and the amount of time needed to commute to the doctor's office. Still, when Plaintiff missed work for appointments, it was typically a minimal change to her scheduled hours.

111.    Despite the company having removed the reasonable accommodation they had previously provided, Plaintiff's work performance was excellent and her sales representatives continued to give her positive feedback.

**Plaintiff Begins Seeing a Therapist and a Psychiatrist About Her Worsening Anxiety**

112.    After a few visits with a clinical social worker through her OBGYN office, the social worker recommended Plaintiff begin seeing a psychotherapist about her anxiety and insomnia arising from her discriminatory treatment at Defendant.

113.    On or about September 9, 2019, Plaintiff had her first appointment with a psychotherapist, and began weekly psychotherapy appointments.

114.    Plaintiff discussed her worsening anxiety coming from her fears of losing her job while pregnant, and how unfair it was that she was being singled out for having to go to medical appointments.

115.    Later that day, Plaintiff emailed HR Manager Plytynski and Manager Noel, providing two doctor's notes for chiropractor appointments she went to that week.

116.    After several appointments with Plaintiff, the psychotherapist recommended that Plaintiff take leave from work out of concern for her physical and mental health, and the health of her unborn child.

117.    On or about September 11, 2019, Plaintiff saw her clinical social worker through her OBGYN's office and discussed her ever increasing anxiety and fear of losing her job due to

the hostile work environment she was facing.  The social worker gave Plaintiff a letter of recommendation for her to see a psychiatrist for ongoing care and treatment of her anxiety.

**Plaintiff and Customer Service Representatives Are Told Not To Report
<u>Co-Worker Figueroa</u>**

118.    Since being selected as the Team Lead, Co-Worker Figueroa was responsible for the distribution of orders within all territories.  Customers and sales representatives were continuously calling in and making complaints about Co-Worker Figueroa missing orders. Plaintiff was forced to deal with these complaint calls.

119.    In a team meeting on or about October 2, 2019, Manager Noel instructed the Customer Service Representatives not to complain to Sales Manager Bart Gammons (hereinafter "Sales Manager Gammons") about Co-Worker Figueroa's mistakes.

120.    This instruction was damaging, because if Plaintiff did not explain to Sales Manager Gammons that Co-Worker Figueroa was repeatedly missing orders, then Plaintiff could be blamed for the missed orders instead of Co-Worker Figueroa.

**<u>Manager Noel Sets Plaintiff Up To Fail</u>**

121.    On or about October 2, 2019, by email, Manager Noel assigned Plaintiff a dental bulk order to process even though Plaintiff had never received any training for bulk order processing.  Manager Noel stated, "I know this looks like a bulk order, but please process." Plaintiff confirmed with her co-worker, Anthony Chan, one of the sales representatives whose accounts Plaintiff managed, that the order she was given to process was indeed a bulk order.

122.    Upon information and belief, bulk orders must be processed by Managers, Supervisors, or employees with specific training due to special pricing guidelines, processing, and large amounts of money involved.  Upon information and belief, Manager Noel told Plaintiff to process the bulk order with the intention that Plaintiff would be punished for processing one.

20

Plaintiff immediately feared that she was purposefully being set up to fail, so that Defendant could fire her and not have to deal with her need for doctor's appointments or maternity leave.

123.    Plaintiff responded to the email and reminded Manager Noel that she did not have any of the necessary training to do this task.

124.    Clearly annoyed, Manager Noel nonetheless told her to "just enter the order."

125.    Plaintiff was dumbfounded.   Upon information and belief, protocol required Manager Noel to send the order to Plaintiff's co-worker Martha, who had been assigned the role of completing bulk orders, and been given training on how to do so.

126.    Highly uncomfortable with this task she was given, and fearing that she would be written up for not performing the task correctly, Plaintiff emailed Manager Noel again, reiterating that she did not want to enter such a large order without proper training.  Plaintiff said she feared she would make a mistake, and be penalized.  Plaintiff reminded Manager Noel that her co-worker, Martha, was assigned the role of entering bulk orders and was always given the bulk orders to process.

127.    Disregarding Plaintiff's concerns again, Manager Noel again ordered her to just put the order in.

128.    Plaintiff, left with no choice, entered the bulk order as best she could with no training at all.

129.    As Plaintiff had feared, on or about October 11, 2019, Plaintiff received an email from Manager Noel informing Plaintiff that she had "missed a step" when processing the bulk order, and reprimanding her for this.  Manager Noel claimed that Plaintiff did not follow her "directive."

130.    Plaintiff replied to the email saying that she had objected to the assignment of this task by telling Manager Noel that she had no training to do bulk orders, but that she nevertheless followed Manager Noel's directive to the best of her ability after Manager Noel insisted she complete the task.  Plaintiff also stated in this email that she would still like to receive the additional training that Manager Noel had promised her if she were to be given more bulk orders to process in the future.

131.    Plaintiff received no response to this email.  Plaintiff's fear that she would lose her job skyrocketed, and she began to suffer from extreme anxiety.  Upon information and belief, Defendant wanted to find a reason to terminate her because she was pregnant, was seeking maternity leave, and because she had a disability that required regular medical appointments.

132.    After these circumstances at work, Plaintiff's anxiety became so extreme that she was worried for her health and the health of her unborn child.  Plaintiff experienced severe headaches, insomnia, difficulty breathing, and chest pains.

**Plaintiff Is Hospitalized Due to Extreme Anxiety Affecting Her Pregnancy**

133.    On or about October 14, 2019, Defendant was closed for Columbus Day.

134.    That day, Plaintiff contacted ADP and received confirmation from an ADP representative that her licensed clinical social worker could sign off on immediate FMLA leave for her mental health.

135.    Plaintiff went to get her social worker to sign off on the FMLA paperwork, but, upon arrival at the OBGYN office, Plaintiff felt lightheaded, dizzy, and faint.

136.    Plaintiff reported these symptoms to an employee at the OBGYN office and was immediately taken to the Labor and Delivery section of the hospital.  There, her condition was monitored by the OBGYN doctor on call for the next several hours.

137.    Plaintiff was monitored and released the same night.  She was diagnosed with overexertion and told to rest and drink lots of water.

138.    Upon her release that night, Plaintiff felt extremely anxious, and experienced chest pains and insomnia.

139.    On the following day, October 15, 2019, Plaintiff contacted Manager Noel to advise her that she would not be in the office because she was still recovering and resting after her visit to the emergency room the day prior.

140.    On or about October 16, 2019, Plaintiff went to her OBGYN office to pick up the FMLA paperwork from her social worker.  Upon arrival at the OBGYN office, Plaintiff experienced difficulty breathing, excessive chest pains, an extreme headache, and dehydration. Plaintiff was seven months pregnant at this point, and based on the severe symptoms she was manifesting, the doctors had her immediately rushed to the hospital.

141.    Plaintiff's baby's heart rate began to slow to a dangerous level, and doctors were gravely concerned with Plaintiff's health and the health of her child.  Plaintiff's health was closely monitored for the next two days.

142.    From the hospital, Plaintiff contacted ADP to advise them that she would be taking immediate mental health leave and she obtained a reference number to provide to her social worker to sign off on the documentation.

143.    Plaintiff contacted her social worker to provide the reference number and was told to pick up the paperwork later that day.

144.    Plaintiff reviewed the discharge paperwork she was given, and then texted Manager Noel and informed her she would be taking a mental health leave effective immediately, and ADP would be receiving the paperwork later that day.  Plaintiff wanted to let Manager Noel know as

early as possible, so that she could make the necessary arrangements before Plaintiff's work shift was scheduled to start that day.

145.    On or about October 16, 2019, Plaintiff's social worker signed off on the FMLA documentation, which detailed her diagnosis and recommended immediate mental health leave, stating that Plaintiff "is diagnosed with adjustment disorder with mixed anxiety and depressed mood" and was "experiencing persistent worry, crying spells, ruminating, challenges with appetite and sleep . . . which is impacting her ability to work and an additional risk factor in her pregnancy."

146.    Plaintiff was released from the hospital on October 18, 2019.

147.    Plaintiff's doctors remained concerned for her health for the duration of her pregnancy, and advised her to not return to work under any circumstances.

148.    On or about October 21, 2019, Plaintiff faxed her previously completed FMLA documentation recommending immediate mental health leave to ADP.

### Plaintiff's FMLA Leave Is Denied, and Her Medical Benefits are Terminated

149.    On or about October 22, 2019, Plaintiff received an email from ADP stating that she was not eligible for FMLA because she did not meet the 12 month and 1250 hour requirement.

150.    Plaintiff knew this was not true since ADP had twice confirmed that her hours worked as a temporary employee counted towards FMLA eligibility.  Including Plaintiff's time worked as a temporary employee, she had clearly met this requirement for FMLA eligibility.

151.    Plaintiff called ADP and spoke to a representative who confirmed that Defendant had reported Plaintiff as starting at Defendant on February 11, 2019, not September 24, 2018, and that no temp hours were provided by Defendant to ADP.

152.    Plaintiff informed the ADP representative she started as a temporary employee on September 24, 2018, and if her temp hours were included, which they should be, she would meet the 1250-hour, 12-month requirement for FMLA eligibility.

153.    The ADP representative informed Plaintiff that ADP could not make any changes to the information they had without Defendant's consent.

154.    Plaintiff understood from her communication with ADP representative Machado during September that ADP would investigate any discrepancy in her hours with her employer. She assumed that ADP would contact Defendant and fix the problem.

155.    As advised by her doctors, Plaintiff did not return to work.  No one at Defendant communicated with Plaintiff after she was released from the hospital.  She assumed that everything was done and that her FMLA leave would be fixed.

156.    On October 31, 2019, Plaintiff received an email from ADP stating that her medical benefits were terminated.

157.    This was the first, and only, communication that Plaintiff received that suggested her employment had been terminated.  No one at Defendant ever communicated any termination of her employment to her or any denial of FMLA leave.

## CLAIMS FOR RELIEF

### AS AND FOR THE FIRST CAUSE OF ACTION
*(Retaliation Under the FMLA)*

158.    Plaintiff repeats and re-alleges each and every allegation above with the same force and effect as if fully set forth herein.

159.    Plaintiff was entitled to FMLA leave to take care of her newborn child and her own serious health conditions and requested the entitled leave.

160.    Defendant retaliated against her for making the request for FMLA leave by harassing her and by terminating her employment.

161.    Defendant partly revealed its motivations for this retaliation by its attitude toward other requests for leave made by Plaintiff.

162.    As a result of Defendant's retaliatory acts, Plaintiff has suffered monetary damage, irreparable injury, mental anguish, pain and suffering, humiliation and ostracism, harm to his employability and earning capacity, painful embarrassment among her family, friends, and co-workers, damage to her personal and professional reputation, disruption of her personal life, the loss of enjoyment of the ordinary pleasures of everyday life, and other compensable damages.

163.    Plaintiff will continue to suffer these damages unless and until the Court grants all of the relief to which she is entitled that is requested herein.

164.    Defendant's conduct was intentional, deliberate, malicious, and in reckless disregard of Plaintiff's rights, entitling Plaintiff to punitive damages.

<u>AS AND FOR THE SECOND CAUSE OF ACTION</u>
*(*Interference Under the FMLA*)*

165.    Plaintiff repeats and re-alleges each and every allegation above with the same force and effect as if fully set forth herein.

166.    Plaintiff was entitled to FMLA leave to take care of her newborn child and her own serious health conditions and requested the entitled leave.   Additionally, Plaintiff sought clarification of her rights to FMLA leave from Defendant and requested assistance in making an appropriate request for FMLA leave.

167.    Defendant interfered with Plaintiff's enjoyment of her FMLA rights by hiding its knowledge of her rights from her, harassing her for seeking to clarify those rights, actively

obfuscating her rights so that she would be confounded in her attempt to assert them, and by terminating her employment.

168.    Defendant partly revealed its motivations for this retaliation by its attitude toward other requests for leave made by Plaintiff.

169.    As a result of Defendant's acts of interference, Plaintiff has suffered monetary damage, irreparable injury, mental anguish, pain and suffering, humiliation and ostracism, harm to her employability and earning capacity, painful embarrassment among her family, friends, and co-workers, damage to her personal and professional reputation, disruption of her personal life, the loss of enjoyment of the ordinary pleasures of everyday life, and other compensable damages.

170.    Plaintiff will continue to suffer these damages unless and until the Court grants all of the relief to which she is entitled that is requested herein.

171.    Defendant's conduct was intentional, deliberate, malicious, and in reckless disregard of Plaintiff's rights, entitling Plaintiff to punitive damages.

## AS AND FOR THE THIRD CAUSE OF ACTION
**(Disability Discrimination and Retaliation Under the ADA and NJLAD)**

172.    Plaintiff repeats and re-alleges each and every allegation above with the same force and effect as if fully set forth herein.

173.    Plaintiff suffered from a disability cognizable under federal and New Jersey State law.  Plaintiff communicated this to Defendant by requesting temporary leave to care for her serious health conditions.

174.    On this account, Defendant harassed Plaintiff and subsequently terminated her employment in violation of the ADA and NJLAD.

175.    Additionally, Defendant refused to grant a reasonable accommodation for Plaintiff's disability.

176.    Finally, Defendant retaliated against Plaintiff for opposing disability discrimination.

177.    As a result of Defendant's acts of discrimination and retaliation, Plaintiff has suffered monetary damage, irreparable injury, mental anguish, pain and suffering, humiliation and ostracism, harm to her employability and earning capacity, painful embarrassment among her family, friends, and co-workers, damage to her personal and professional reputation, disruption of her personal life, the loss of enjoyment of the ordinary pleasures of everyday life, and other compensable damages.

178.    Plaintiff will continue to suffer these damages unless and until the Court grants all of the relief to which she is entitled that is requested herein.

179.    Defendant's conduct was intentional, deliberate, malicious, and in reckless disregard of Plaintiff's rights, entitling Plaintiff to punitive damages.

### AS AND FOR THE FOURTH CAUSE OF ACTION
**(Sex and Pregnancy Discrimination and Retaliation Under Title VII and NJLAD)**

180.    Plaintiff repeats and re-alleges each and every allegation above with the same force and effect as if fully set forth herein.

181.    Defendant treated Plaintiff differently from male and non-pregnant employees on account of her female sex and pregnancy by creating a hostile work environment and by denying her privileges of employment that it regularly grants to male and non-pregnant employees, including leave to care for a newborn child and leave to care for her own serious health conditions. Ultimately, Defendant terminated Plaintiff's employment on account of her sex and gender. These acts violated Title VII and NJLAD.

182.    Additionally, Defendant retaliated against Plaintiff for opposing sex and pregnancy discrimination.

183.    Defendant revealed its invidious motivation for this different treatment and retaliation through numerous comments and actions.

184.    As a result of Defendant's acts of discrimination and retaliation, Plaintiff has suffered monetary damage, irreparable injury, mental anguish, pain and suffering, humiliation and ostracism, harm to her employability and earning capacity, painful embarrassment among her family, friends, and co-workers, damage to her personal and professional reputation, disruption of her personal life, the loss of enjoyment of the ordinary pleasures of everyday life, and other compensable damages.

185.    Plaintiff will continue to suffer these damages unless and until the Court grants all of the relief to which she is entitled that is requested herein.

186.    Defendant's conduct was intentional, deliberate, malicious, and in reckless disregard of Plaintiff's rights, entitling Plaintiff to punitive damages.

## AS AND FOR THE FIFTH CAUSE OF ACTION
### (Race Discrimination Under Title VII and NJLAD)

187.    Plaintiff repeats and re-alleges each and every allegation above with the same force and effect as if fully set forth herein.

188.    Defendant treated Plaintiff differently from other employees on account of her African-American race by paying her less well, by creating a hostile work environment, and by denying her privileges of employment, including preferential job assignments, leave to care for a newborn child, and leave to care for her own serious health conditions.  Ultimately, Defendant terminated Plaintiff's employment on account of her African-American race.  These acts violated Title VII and NJLAD.

189.    Additionally, Defendant retaliated against Plaintiff for opposing race discrimination.

190.    Defendant revealed its invidious motivation for this hostile work environment, different treatment, and retaliation through numerous comments and actions.

191.    As a result of Defendant's acts of discrimination and retaliation, Plaintiff has suffered monetary damage, irreparable injury, mental anguish, pain and suffering, humiliation and ostracism, harm to her employability and earning capacity, painful embarrassment among her family, friends, and co-workers, damage to her personal and professional reputation, disruption of her personal life, the loss of enjoyment of the ordinary pleasures of everyday life, and other compensable damages.

192.    Plaintiff will continue to suffer these damages unless and until the Court grants all of the relief to which she is entitled that is requested herein.

193.    Defendant's conduct was intentional, deliberate, malicious, and in reckless disregard of Plaintiff's rights, entitling Plaintiff to punitive damages.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff requests that this Court grant her judgment as follows:

(i)     declaring that the acts and practices complained of herein are in violation of the FMLA, ADA, Title VII, and NJLAD;

(ii)    permanently enjoining and restraining the violations alleged herein, and ordering that Defendant submit to supervised anti-discrimination and anti-retaliation training and monitoring to avoid a repeat of the violations alleged herein;

(iii)   awarding Plaintiff monetary damages for lost wages and benefits, for her mental pain and suffering, and for other damages and harm suffered in an amount to be determined at trial;

(iv)    awarding Plaintiff punitive damages in an amount to be determined at trial;

(v)     awarding Plaintiff the costs of this action together with her reasonable attorney fees incurred in pursuing these claims; and

(vi)    granting such other and further relief to Plaintiff as this Court deems appropriate.

Dated: New York, New York
       July 15, 2021

                                        Respectfully submitted,

                                        GODDARD LAW PLLC
                                        *Attorneys for Plaintiff*

                                        By:   /s/ *Megan S. Goddard*
                                        Megan S. Goddard, Esq.
                                        39 Broadway, Suite 1540
                                        New York, NY 10006
                                        Ofc: 646-504-8363
                                        megan@goddardlawnyc.com